# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| FSS, INC., d/b/a FRONT STREET SHIPYARD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket no. 1:16-CV-300-GZS |
| | ) |
| W-CLASS YACHT COMPANY, LLC and W-US-1, LLC, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court conducted a five-day bench trial in this admiralty action from August 8-14, 2017, at which it received witness testimony and documentary evidence. The bench trial transcript was filed on October 5 and 6, 2017 (ECF Nos. 95-98, 100).[1] The parties submitted proposed findings of fact and conclusions of law on November 6, 2017 (ECF Nos. 103 & 104) and responses to the proposed findings of fact and conclusions of law on November 27, 2017 (ECF Nos. 110 &

---

[1] At the bench trial, the following witnesses testified: Joseph Lobley, a marine surveyor, who testified for Plaintiff as to the appropriateness of Front Street's charges for work on the sailing vessel *Wild Horses*; Jonathan Chapman, a yacht broker, who testified for Defendants as to the value of the motor vessel *Mare*; Matthew Dowling, Defendants' expert on welding and the plating on *Mare*; Shelden Leonard, the marine electrician at Front Street at the time of the work on *Mare*; Benjamin Davis of True Course Yachting, W-Class's project manager on the *Mare* refit; Bruce Richardson, Plaintiff's expert on welding and the plating on *Mare*; John Koopman, a marine engineer who worked on the vibration issue affecting *Wild Horses* after it left Front Street; Sarkis Keuleyan, a marine electrician who worked on *Mare* at the Charleston City Marina; Michael Taylor, a marine surveyor and consultant, who testified for Defendants as to his inspection of *Mare*; Sean Lundy, a consultant and marine engineer, who testified for Plaintiff as to his inspection of *Mare*; Thomas Farrell, a naval architect, who also testified for Plaintiff as to his inspection of *Mare*; Michael Tatro, who was the systems manager for Front Street during the *Mare* refit; Dale Whitman, the fabrication supervisor at Front Street during the *Mare* refit; Lloyd Bryant, the paint manager at Front Street during the *Mare* refit; Robert Peckham, a yacht broker, who testified for Plaintiff as to the value of *Mare*; and Kevin Clarke, a marine surveyor, who testified for Defendants as to his inspection of *Mare*'s coatings. John B. Turner, Front Street's president, and Donald Tofias, Defendants' principal, also testified. The Court admitted edited transcripts and videos from the depositions of Craig Mitchell, the paint shop supervisor at Newport Shipyard; Richard Franklin, the machine shop and mechanics supervisor at Newport Shipyard; and Heath Moldveen, a paint sales representative who observed the paint conditions on the bottoms of *Mare* and *Wild Horses* at Newport Shipyard.

111).  In accordance with Federal Rule of Civil Procedure 52, the Court has reviewed all of the evidence presented and now FINDS for Plaintiff.  Specifically, the Court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT[2]

### Parties and Vessels

1. W-Class Yacht Company, LLC ("W-Class") is a Delaware limited liability company in the business of building, marketing, and selling vessels ranging from 22 to 135 feet.  Donald Tofias is W-Class's managing member and president.  Tofias is generally known as a conscientious and fastidious yacht owner who often has people working on his vessels.

2. W-Class has maintained its principal office at Newport Shipyard in Newport, Rhode Island, for at least the past fifteen years and has used that yard's services to do repair, painting, refit, and other work on W-Class vessels for the past fifteen to nineteen years.  At all times relevant to this matter, the vessels at issue were officially or unofficially "home ported" at Newport Shipyard.

3. The Motor Vessel *Mare* (hereinafter "M/V *Mare*" or "*Mare*") is a 45-foot, steel-hulled, 1946 Navy workboat built in Brooklyn, New York.  W-Class acquired the M/V *Mare* (USCG Official No. 250428) in September 2009 and has owned the vessel through the time of trial in this matter.  During the periods of 2012-13 and 2016-17, *Mare* was insured for $250,000.

---

[2] Regarding pending rulings on the admissibility of certain trial exhibits, the Court admits Defendants' Exhibits 7 and 16 as business records pursuant to Federal Rule of Evidence 803(6).  To the extent it has not already been finally admitted, the Court admits Defendants' Exhibit 158.  Defendants' Exhibits 93 and 94 have already been admitted over objection.  (See 8/14/17 Trial Tr. (ECF No. 100), PageID # 1688.)  The Court also admits Defendants' Exhibit 165 over Plaintiff's hearsay objection in light of the fact that Defendants' Exhibit 22, which is also a paint manufacturer's specifications sheet kept in the records of Newport Shipyard, has already been admitted without objection.

4. W-Class used *Mare* to assist in the marketing of W-Class vessels, as a place to entertain guests, and sometimes as a place for Tofias to live. Prior to the periods at issue in this matter, W-Class undertook a number of improvements to the vessel, including adding a mast, spreaders, a boom and gaff, a stainless steel barbecue grill, a swim platform, a stainless steel swim ladder, and a stainless steel ladder from the deck to the roof of the wheelhouse. W-Class also installed a new turbo diesel engine.

5. W-US-1, LLC ("W-US-1") is a Rhode Island limited liability company and a wholly owned subsidiary of W-Class. Tofias is the managing member.

6. The Sailing Vessel *Wild Horses* (hereinafter "S/V *Wild Horses*" or "*Wild Horses*") is a 76-foot, cold-molded wooden vessel built in 1997-98 at Brooklin Boatyard in Brooklin, Maine. W-US-1 owned the S/V *Wild Horses* (USCG Official No. 1064210) at all times relevant to this matter and used the vessel to run races.

7. FSS, Inc., d/b/a Front Street Shipyard ("Front Street") is a full-service marine facility in Belfast, Maine, that undertakes new construction and vessel refit and repair, with a focus on larger vessels over 150 tons. Front Street has been in business since 2011. At all times relevant to this matter, John B. "J.B." Turner was Front Street's president. As part of his duties at Front Street, Turner organizes the general work flow in the yard with two service managers and one project manager and oversees particular refit projects.

8. Tofias first did business with Front Street in August 2011. At that time, Tofias asked Front Street to set up an account in the name of W-Class for work to be done on *Wild Horses*. That work is not at issue in this matter.

9. Payments against invoices issued by Front Street for work on *Mare* or *Wild Horses* as described below were made by check from a W-Class bank account or by credit cards issued to Tofias personally or to one of his companies.

10. It was the practice of W-Class and W-US-1 to keep maintenance logbooks aboard their vessels. A maintenance log is an ongoing record of maintenance required on a vessel and what maintenance steps are being taken. Prior to trial, Plaintiff requested the production of logbooks from both vessels for the period between January 1, 2013, and January 1, 2015. W-Class and W-US-1 have not produced any logbooks whatsoever for *Mare* and have produced only one logbook covering the period from July 2013 to October 2015 for *Wild Horses*. Tofias is unable to offer any explanation for his inability to locate the missing logbooks. (See Pl.'s Ex. 67.) The *Mare* logbooks would have notations about maintenance and what was and was not working on the vessel. The *Wild Horses* logbooks that were produced noted maintenance needs and vessel conditions.

## M/V *Mare*

11. On August 2, 2012, Tofias was seriously injured in a sailing accident that incapacitated him for the following six months. Because of Tofias's injury and his inability to use *Mare*, he decided to undertake significant renovations to the vessel.

12. True Course Yachting, Inc. ("True Course") is a yacht management company that assists vessel owners with vessels under 100 feet by providing crew services, project management, cleaning, and detailing. Regarding the project management component of the business, True Course generally acts as the "eyes and ears" for vessel owners during a yard project. Ben Davis is the founder and principal owner of True Course and a licensed captain.

13. Due to his incapacity, Tofias retained Davis and True Course to be W-Class's project manager for the *Mare* refit.[3]

14. Davis retained Joseph Lombardi of Ocean Technical Services, LLC, a marine surveying company, to survey *Mare* and prepare a proposed scope of services for necessary repairs, including replating the vessel's bottom. Lombardi prepared and provided to Davis a written survey report regarding the condition of *Mare* dated August 27, 2012. Lombardi also prepared a document entitled "Requirements and Specifications for Drydocking and Repair of M/V 'Mare'" dated September 1, 2012.

15. In the survey report, Lombardi noted, inter alia:

- "Moderate failure of the paint system throughout the maindeck (foredeck, amidships and aft) and cabin trunk area is causing rust/scale to break through." (Defs.' Ex. 38, Bates No. 004349.)

- "The bottom paint system has not been correctly applied to recent shell plating doublers and is currently peeling away." (Id., Bates No. 004351.)

- "Condition of [the forepeak tank] is fair/good with much rust/scale and some wastage of transverse frames and intercostals due to water entering through BOMAR hatch. Shell plating in space in poor condition." (Id., Bates No. 004353.)

In light of the survey, Lombardi made several recommendations, including:

- "Anti-fouling paint system is somewhat failing below the waterline and particular care must be taken with respect to the bottom coatings as absence of coatings inevitably lead[s] to plate loss due to potential (galvanic corrosion). Remove existing paint system and renew with a steel primer and an ablative anti-fouling system compatible with an impressed cathodic system for the habitual berth of the vessel." (Id., Bates No. 004358.)

- "Repair/replace BOMAR dogging hatches and gaskets on foredeck and aft deck." (Id.)

- "Properly clean bilges of standing oil/water." (Id., Bates No. 004359.)

---

[3] Tofias vigorously disputes that Davis was the "project manager," but Davis understood himself to be the project manager and Tofias himself also referred to Davis as such. (See Pl.'s Ex. 88.)

- "Replace broken bilge pump in engineroom."  (Id.)[4]

Lombardi concluded: "This vessel is in good cosmetic condition, but requires significant steel shell plate work and interior framing under the head. . . . Choices made to double plate on hull [are] only delaying the day of reckoning and this should be addressed; other areas of original shell plating (bow and chines) need immediate repair."  (Id.)  Lombardi also concluded that the plate on *Mare*'s hull was ¼-inch thick.

16. Davis sent copies of the Lombardi reports to a number of shipyards in the process of determining which yard should do the *Mare* refit.  Davis may have provided Front Street with one or both of the Lombardi reports.

17. Although Davis compiled research and information on several yards, Tofias did not rely on this research in choosing to give the *Mare* refit to Front Street.  Tofias ultimately selected Front Street based on the recommendation of Steve White, the owner of Brooklin Boatyard who also has a stake in Front Street, and based on Turner's representation that Front Street could handle the work and had the necessary experience.  Davis believed that Front Street was in fact *over*qualified to do the work based on the positive reputation in the yachting industry of the individuals who ran the yard.

18. Front Street had worked on steel-hulled vessels before, but not on steel-hulled vessels with as much square area as *Mare*.  Prior to the fall of 2012, Davis had never been involved in a major refit of a steel-hulled vessel such as *Mare* or overseen the replating of the bottom of such a vessel.

---

[4] There is no direct evidence in the record that a bilge pump was replaced on *Mare*, but there is also no direct evidence that *Mare*'s bilge pumps were not working during the periods at issue in this matter.

19. On September 25, 2012, Turner sent an email to Tofias and Davis with the subject "Mare and 135." As an attachment to the email, Turner included a "bid for the work this winter on Mare." (Defs.' Ex. 35.) Under "Plating Project," the attached bid states, in relevant part:

> The following estimate is for replating the hull on Mare per the specifications provided. The replating work will begin 2 feet above the chine as marked on the boat. . . . Three frames under the head will be replaced. The pipe used to create the chine and receive the plating from the topsides and bottom will be completely replaced. Sandblasting, priming and painting will follow to create a seal against corrosion.

(Id.) The Court infers from the final sentence in context that Front Street represented it would sandblast, prime, and paint the new steel plates, as opposed to every element in the vessel's bilge, to "create a seal against corrosion."

20. In the body of his September 25, 2012 email, Turner states that "as soon as there are drawings to begin the new project, Front Street will be ready to start" (Defs.' Ex. 35), but the reference to drawings is for a different project than the *Mare* refit, a proposed project to construct a new vessel.

21. Tofias did not accept the "bid" attached to Turner's September 25, 2012 email. After further discussion, Front Street submitted a second bid dated October 23, 2012. The primary difference between the September and October bids is a reduction in the number of hours that Front Street indicated would be needed to complete the project and a reduction in the hourly rate in an effort by Front Street to secure the project. Turner has no recollection of what work, if any, was removed from the September bid to account for the reduction in the number of estimated hours.

22. Tofias accepted the October bid, which was the final formal written document concerning the *Mare* refit and provided the baseline for the project. Neither the Lombardi reports nor a separate Lombardi document superimposing hull thickness readings on a drawing of *Mare*

(Defs.' Ex. 172) were used as a basis for Front Street's work on the vessel.[5]  There was no

written contract.  Tofias declined to sign a written contract offered by Front Street.

23. Front Street undertook the *Mare* refit between October or November of 2012 and June or July

of 2013.

24. Tofias authorized Davis to communicate progress on the project to him, to approve invoices,

and to represent to Front Street what Tofias's decisions were regarding issues that arose during

the project.  Once Tofias gave Davis approval or authorization to take a position or to make a

move on the project, Davis was authorized to act as Tofias's mouthpiece with Front Street and

to pass along Tofias's approval.  Davis exercised such authority.

25. Two to four days a week during the course of the project, Davis provided Tofias with project

updates, including sending Tofias via email photos and comments on the progress, advising

him of additions to the scope of work recommendations from the yard, and reviewing and

approving Front Street invoices.  Tofias asked Davis to review the invoices because, as the

person at the site, Davis had a better understanding of the hours and tasks on the project.

During the periods of highest activity on the project, Davis was at Front Street daily.

26. Tofias was only physically present at Front Street one time during the *Mare* refit, but he was

kept up-to-date and fully informed of all aspects of the work done on *Mare* by Front Street as

a result of the frequent and consistent flow of emails between him and Davis, as well as

---

[5] The Court credits Turner and Davis's testimony that no external document, such as the Lombardi reports, provided a reference or specification for the work on *Mare* at Front Street.  The Court also notes that in his pretrial deposition, as opposed to during his testimony at trial, Tofias could not recall any survey or set of specifications being used as a basis for the *Mare* refit at Front Street.  (See Pl.'s Ex. 63, pp. 12, 16.)  Each time entry on the *Mare* invoices associated with the replating carries the reference "[r]eplace hull plating per survey."  (See, e.g., Defs.' Ex. 153.)  However, Turner credibly testified that no specification for hull thickness was relied upon by Front Street other than the yard's determination of hull thickness based on its own sampling.  Regarding the use of the term "specifications" in the bid documents, the Court credits Turner's explanation that he "will often use the word specifications based on a conversation back and forth between people" (Defs.' Ex. 183, p. 144).

between him and Turner.[6]  Davis discussed every aspect of the *Mare* refit with Front Street

because it was such an extensive project.

27. *Mare*'s hull at the time it was hauled at Front Street was 3/16-inch thick.[7]  When the vessel

was hauled, the yard cut a small sample from the vessel's hull to determine the overall

thickness of the hull plating but did not retain the piece or record from where it was cut.  Turner

advised Davis via email that it was a good thing that Front Street had not ordered a lot of ¼-

inch steel plate because it appeared that the plating was in fact 3/16-inch thick.  Davis read this

email and was present at Front Street during the replating.  Tofias was also aware that Front

Street was replating *Mare*'s bottom with 3/16-inch plate.  Three-sixteenths-inch steel plating

is structurally adequate for *Mare*.[8]

28. As part of replacing *Mare*'s bottom, Front Street applied two coats[9] of Micron CSC anti-

fouling paint to the new steel plates after it properly prepared, profiled, and primed them.

"Profiling" steel is the process of creating a rough surface on new steel to which primer can

---

[6] The Court finds Davis's testimony that he kept Tofias up-to-date and discussed every aspect of the project with him to be credible in light of the email correspondence in the record.  The Court does not credit Tofias's claims to the contrary, especially in light of the fact that at trial Tofias vociferously denied seeing emails to which he had in fact responded.  (See, e.g., 8/9/17 Trial Tr. (ECF No. 96), PageID #s 1101-03; Pl.'s Ex. 100.)

[7] Although Lombardi concluded that the hull was ¼-inch thick, the Court concludes that the hull was in fact 3/16-inch thick based on (i) Turner's credible testimony and his contemporaneous email to Davis; and (ii) the fact that all of the witnesses who later gauged the thickness of *Mare*'s hull found consistent hull thickness between the areas replated by Front Street and areas of the hull that were not replated.  It is also not clear that Lombardi accounted for double plating on the hull when he gauged the hull thickness.

[8] The Court does not understand Defendants to be pressing any contention that Front Street breached the oral contract by failing to replace the keel.  The Court notes, however, that replacing or replating *Mare*'s keel was not part of the scope of the refit project and the keel was not in fact replaced or replated.  Turner discussed the keel issue with Davis and it was decided that Front Street would not replace or replate the keel.  During the replating project, Davis and Turner sent Tofias photographs of *Mare* with its steel bottom plates, *but not the keel*, removed in anticipation of the installation of new plating.  (See, e.g., Pl.'s Exs.  98-99, 103/103A, 105/105A, 107, 110.)

[9] Front Street's paint manager Bryant testified that Front Street applied two coats of paint to the interior faces of the plates but was not asked and did not clearly testify that Front Street applied two coats to the *exterior* faces.  However, the bid documents state that Front Street would apply two coats of bottom paint to *Mare* (see Defs.' Ex. 36) and there is no credible evidence that Front Street did not in fact apply two coats to the hull exterior.

adhere.  If the steel is profiled to an insufficient degree, the primer may not adhere.  If the primer is applied too thinly, the steel under the primer and bottom paint coat may rust.

29. Front Street did not gauge the degree of profiling and the thickness of the primer or keep detailed records of the temperature and other conditions during the coating of *Mare*'s plates. However, the preponderance of the evidence does not establish that Front Street applied the coatings improperly, and Davis was satisfied with Front Street's coatings work.[10]

30. Front Street asked for authority to paint the bottom of the fuel tanks on *Mare*, which authority was provided by Tofias through Davis.  However, Front Street failed to coat the interior side of the new steel *under* the fuel tanks.  There was no reason why Front Street could not have applied coatings to this area, and it was poor marine practice for Front Street to leave this new steel uncoated.

31. The welds made by Front Street during the replating of *Mare*'s bottom were not "pretty" (8/10/17 Trial Tr. (ECF No. 97), PageID # 1354) but were sound.  The welds met applicable standards, had structural integrity, and did not compromise the vessel's seaworthiness.[11]

_____

[10] Specifically, there is no unequivocal and credible evidence that Front Street incorrectly cleaned the plates before applying primer, put on too little primer or paint, or missed the "windows" for applying the various layers of coatings. Contrary to Defendants' contention, there is also no clear evidence that Front Street's workers walked on the uncoated steel plates or left them unprotected to a greater extent than is acceptable.  (See 8/11/17 Trial Tr. (ECF No. 98), PageID # 1669.)  The evidence that Front Street insufficiently profiled the plates before applying coatings is also equivocal at best.  For example, Front Street's paint manager Bryant seemed to testify that Front Street only profiled the plates to remove the "mill scale" (8/11/17 Trial Tr., PageID # 1680), and Defendants' coatings expert Clarke testified that merely removing mill scale is not sufficient profiling (8/14/17 Trial Tr., PageID # 1727).  However, the Court understands Clarke to have meant that not using a media blast to profile is improper (8/14/17 Trial Tr., PageID # 1727) and Bryant testified that Front Street *did* use a media blast, silica sand, to profile the plates before applying primer (8/11/17 Trial Tr., PageID # 1679).  The Court does not consider the coatings and profiling measurements taken during the course of the present litigation to be reliable given the imprecise methods used (see, e.g., 8/14/17 Trial Tr., PageID #s 1759-65) or relevant to the issue of Front Street's liability considering that *Mare*'s bottom was recoated between the time the vessel left Front Street and the commencement of the litigation.

[11] In this regard, the Court credits the testimony of Plaintiff's expert, Bruce Richardson, over the testimony of Defendants' expert, Matthew Dowling.  In particular, Richardson exhibited a greater familiarity with the standards of shipyard welding on vessels like *Mare*; Dowling seemed most familiar with inapposite welding standards for submarines and power plants.

32. A Seakeeper gyro stabilizer reduces the side-to-side rolling motion of a vessel. Although Tofias understood that the purpose of a Seakeeper is to substantially eliminate the rolling motion of a vessel in *rough waters*, the Court understands that a Seakeeper also reduces a vessel's rolling motion in all conditions.

33. At some point, the possibility of installing a Seakeeper on *Mare* arose in conversations between Turner, Davis, and Tofias. Based on these conversations and Davis's recommendation, the decision was made to install a Seakeeper.[12] Neither Front Street institutionally nor the lead electrician who did the installation had ever previously installed a Seakeeper on a vessel. Tofias considers the Seakeeper to be an improvement to *Mare*.

34. The preponderance of the evidence does not establish that Front Street overcharged W-Class for the Seakeeper installation.[13]

35. Tofias was advised by Front Street that the existing wiring on *Mare* should be replaced or rewired because it was not up to current standards, but he was not told that the existing wiring was unsafe.[14] Tofias did not authorize the rewiring work because it was not in his budget for

---

[12] Although the parties suggest in their briefing that a slightly used Seakeeper was installed, the Court has not been presented with clear and credible evidence regarding the unit's provenance. In any event, Defendants are not claiming that there was an issue with the unit itself as opposed to Front Street's installation of the unit.

[13] Even assuming that W-Class can challenge a facially evident overcharge on an invoice it already paid, the evidence that there was an overcharge is equivocal at best. W-Class contends that Front Street exceeded a "will not exceed" estimate, but Front Street only provided a "will not exceed" estimate for the labor cost involved in the Seakeeper installation. (See Defs.' Ex. 176.) Front Street contends that it did not exceed the labor cost estimate for the Seakeeper installation itself as opposed to related structural work in the vessel (see Defs.' Ex. 153, Bates Nos. 000177, 000182, 000191), and the preponderance of the evidence supports Front Street's contention.

[14] Front Street's marine electrician Leonard seemed to testify that he met Tofias several times in person at Front Street during the *Mare* refit, but Tofias was only present at Front Street during the refit on one occasion. The Court finds Leonard to be generally credible and concludes that Leonard is simply misremembering in-person conversations he had with Davis on Tofias's behalf. The Court credits Leonard's recollection that he had telephone conversations with Tofias about *Mare*'s wiring over Tofias's testimony that he never spoke with Leonard.

the project. He would have authorized the work, however, if he had been told that the wiring was unsafe.

36. Front Street also painted some portion of *Mare*'s topsides, including the vessel's railings, decks, and wheelhouse. There is no credible evidence that this work by Front Street was deficient or was the cause of any subsequent problem with the paint on *Mare*'s topsides.[15]

37. Whenever Front Street suggested to Tofias that additional work was required during the refit, including additional work on *Mare*'s steel frames, Tofias authorized the work. The only work suggested by Front Street or mentioned in the written bids that Tofias did not authorize was the addition of teak decks, rewiring the boat, and renovating the windows and portholes. Although the Lombardi reports mentioned that the Bomar hatches merited replacement, hatch replacement or repair was not discussed with Front Street and was never within the scope of work for the *Mare* refit. Recoating every existing surface within the bilge was also not within the scope of work.

38. When *Mare* left Front Street in the summer of 2013, Davis was satisfied with all the work that had been done by the yard.

39. Front Street charged W-Class $347,288.93 for the work undertaken on *Mare* while she was at the yard in 2012-13, which sum was paid in full.

40. At some point after the *Mare* refit was completed, Davis became the W-Class fleet manager, which entailed performing general oversight of the W-Class vessels. In that capacity, Davis was around *Mare* on a frequent basis. He also became the captain of *Wild Horses*.

---

[15] The only clear evidence presented regarding failure of paint on the topsides after Front Street's work was testimony by Tofias and an invoice for subsequent painting work performed at Newport Shipyard. (See 8/8/17 Trial Tr. (ECF No. 95), PageID #s 987-90; Defs.' Ex. 157.) The Court does not credit Tofias's testimony and the invoice does not in and of itself constitute evidence of a paint failure attributable to Front Street.

41. Davis did not experience any issues with *Mare*'s operation or condition during the summer of 2013 and when he navigated the boat from Newport to Florida that fall.[16]  After the refit at Front Street, *Mare* was used weekly, if not daily, and approximately 3,500 miles were put on *Mare* between when the vessel left Front Street and the spring of 2014.

42. The Seakeeper operated satisfactorily and there were no issues with the aspects of *Mare* that Front Street had worked on from the time she left the yard through April 2014.  On January 20, 2014, Tofias emailed Turner, Davis, and others, a picture of *Mare* at harbor with the message, "m/v 'Mare' . . . Sitting in a warm Florida Marina for the Wintah!  She loves her new steel plates, & Seakeeper Gyro.!  Thx JB, Ben & FSS!"  (Pl.'s Ex. 81.)  On April 21, 2014, Tofias emailed Turner and Davis that *Mare* was heading north from Florida and that she was "running well."  Tofias noted a "couple nits . . . the new fuel gauges are worthless . . . [s]tuffing box is leaking a bit . . . steering [is] squishy . . . [w]e will sort it all out."  (Pl.'s Ex. 82.)[17]

43. During the winter of 2013-14 when *Mare* was moored in the Palm Harbor Marina at Lake Worth, Palm Beach, Florida, Tofias had to clean the bottom every two weeks due to very aggressive underwater growth in that harbor.  Cleaning attached sea life off a vessel bottom, or "defouling," may be accomplished by scraping or scrubbing the bottom, which may in turn scrub away ablative anti-fouling paint or create scratches or breaks in exposed primer.  Scratches or breaks in the primer on a vessel bottom generally necessitates recoating.

---

[16] To be precise, Davis navigated *Mare* from Rhode Island but got off the vessel less than a week before it reached its final destination in Florida while his father and two friends remained on board.

[17] The Court does not credit Tofias's contention that he was unaware that the Seakeeper was not working because *Mare* had only navigated in calm waters to that point.  Granting that *Mare* had been in the calm waters of the Intracoastal Waterway and Florida marinas for some periods after it left Front Street, the Court does not think it credible that *Mare* had never navigated through rough waters from when it left Front Street through April 2014.  Furthermore, the Court infers from the testimony of Sarkis Keuleyan that whether a Seakeeper is operating can be determined even in calm waters based on whether the Seakeeper counteracts the rolling motion caused by people walking back and forth on a vessel.

44. While *Mare* was in Charleston, South Carolina, on the journey north to Newport in April 2014, Tofias had a local diver check the vessel's bottom and the diver found no paint on the bottom. On April 22, 2014, Tofias described the condition of *Mare*'s bottom as "[n]o raw steel[,] [b]ut no paint." (Pl.'s Ex. 118.)

45. Tofias navigated *Mare* from Charleston to Newport with only primer on the bottom. It is not good marine practice to navigate a vessel with only primer on the bottom because the bottom may get fouled quickly.

46. When *Mare* arrived at Newport Shipyard in May 2014, Tofias hauled the boat and had his crew, but not the Newport Shipyard painting crew, undertake a coating project on the vessel's bottom. Newport Shipyard typically allows vessel owners to use their own crew or contractors to do work while a vessel is at the yard. Newport Shipyard normally keeps detailed records for any project undertaken by the yard's painting crew, but there are no records whatsoever concerning the scope of the May 2014 work on *Mare*.

47. There is no credible evidence concerning the scope of the coatings works undertaken by *Mare*'s crew. However, the credible evidence supports a reasonable inference that after navigating to Newport from Florida with a primer-only bottom and defouling the bottom, *Mare*'s crew not only added bottom paint, but also may have ground down the coatings to raw steel, profiled the surface, and reapplied primer.

48. In December 2014, *Mare* docked at the Charleston City Marina in South Carolina. At that time, Tofias reported that the Seakeeper was not working as he expected. Charleston City Marina retained Sarkis Keuleyan, through his company SeaTec Marine, to investigate. Keuleyan was experienced with installing Seakeepers on older vessels, but was not a certified Seakeeper installer. Tofias specifically told Keuleyan "that the Seakeeper was not working

properly, the way he had anticipated it to work, and we then started looking at reasons as to why this was happening." (8/11/17 Trial Tr. (ECF No. 98), PageID # 1408.) Tofias also told Keuleyan that he had been experiencing problems with the *Mare*'s charging and inverting systems, as well as some other issues with the vessel's 120-volt system.

49. Tofias asked Keuleyan to perform an evaluation of *Mare*'s electrical system. During his evaluation, Keuleyan discovered that the wiring distributing electricity from the shore power receptacle to the rest of the vessel was undersized and did not meet applicable standards. Undersized wiring is not able to handle the electrical current being provided to the vessel.

50. Keuleyan determined that the vessel did not require a complete rewiring but that some systems needed to be rewired to bring them up to American Boat and Yacht Council ("ABYC") standards and obsolete wiring needed to be labeled or removed. ABYC provides the nationally accepted standards for the construction and repair of recreational vessels such as *Mare*. The same relevant ABYC standards were in effect at the time of the *Mare* refit at Front Street as at the time Keuleyan performed his evaluation. Keuleyan informed Tofias that he would not undertake any repairs to the vessel's wiring system unless all of the relevant electrical equipment was brought up to ABYC standards. Although it is not required to replace all existing wiring and circuitry on a vessel to meet current standards when installing or replacing a piece of equipment, it is good practice to do so.

51. Keuleyan also concluded that Front Street had not installed an Equipment Leakage Circuit Interrupter ("ELCI") on the *Mare* when it installed the Seakeeper, although at the time the Seakeeper was installed by Front Street the ABYC electrical standards required the installation of an ELCI on a vessel like *Mare*. An ELCI kills power to the vessel's electrical system if it detects a 30-milliamp ground fault current in order to prevent the possibility of electrocution.

52. After installing the ELCI, Keuleyan determined that the Seakeeper was tripping when he attempted to run it off *Mare*'s generator, but that the circuit breaker as installed by Front Street was not registering that the system had tripped. The circuit breaker was not visually indicating an electrical fault because the breaker was not truly a three-pole breaker but was instead a two-pole breaker jury-rigged to a single-pole breaker.[18]

53. Keuleyan also determined that although the invoice for Front Street's electrical work on *Mare* stated that the electrical panel associated with the Seakeeper had been wired for 240 volts (Defs.' Ex. 153, Bates No. 000199), the panel was in fact only wired for 120 volts (8/11/17 Trial Tr., PageID # 1415).

54. All told, Keuleyan upgraded *Mare*'s electrical wiring, installed proper breakers, installed an ELCI, installed a galvanic isolator, and reconfigured the electrical distribution panel so that all

---

[18] In their Proposed Findings of Fact, Defendants state, "Keuleyan discovered that Front Street installed an improper circuit breaker on the generator of *Mare* which caused the Seakeeper to record an electrical fault which caused it to shut down." (Defs.' Proposed Findings of Fact and Conclusions of Law (ECF No. 103), PageID # 1930.) Keuleyan's testimony on this point was as follows:

> [W]hen we corrected the wiring and after installing the ELCI, we had noticed that the Seakeeper was tripping the ELCI when on shore power, so in order to diagnose the Seakeeper as to whether or not it was truly generating a ground fault we had to power the Seakeeper up by the generator. When we did that, we had noticed that . . . one leg of the generator was losing power. We lost L1, which is a 120-volt leg. When we looked at the generator and, of course, this is going back to the primary troubleshooting, you go back to the source of power, the L1 coming out of the generator was lost, which was a little confusing because there's a three-pole circuit breaker on the generator and visually it appeared as if it had not tripped, but when we took it apart to get to the backside of it, we realized that it was not truly a three-pole breaker. It was a two-pole breaker tied into a single-pole breaker . . . and what was happening was the single-pole breaker had tripped internally, but didn't have enough tension strength to pull the toggle of the double-pole breaker into the off position. So visually it appeared as if the breaker was still on when, in fact, internally the single-pole breaker had tripped.

(8/11/17 Trial Tr., PageID #s 1416-17.) It is not entirely clear to the Court whether Keuleyan was testifying that the circuit breaker was somehow responsible for the Seakeeper shutting down or whether the circuit breaker was merely failing to register that the Seakeeper had experienced an electrical fault. Regardless, it is clear that Keuleyan determined that a wiring issue was causing the Seakeeper to experience an electrical fault.

of the systems on *Mare* met ABYC electrical standards. Keuleyan also installed an isolation transformer to isolate *Mare* from potential shore power dangers.

55. After completion of Keuleyan's work, the Seakeeper was tested at the dock and worked properly according to Keuleyan. At the time of trial in this matter, however, the Seakeeper does not work at all when *Mare* is at sea.[19]

56. The next time *Mare* was hauled after May 2014 was on July 5, 2015, again at Newport Shipyard. Shortly after *Mare* was power-washed to remove marine growth on the bottom, Tofias and others observed numerous blisters the size of quarters on various areas of the bottom, including at the waterline. At least some of the blisters were "full thickness" blisters, meaning they affected all layers of coatings and when broken exposed the bare rusted steel of the bottom.

57. W-Class retained Newport Shipyard to address the blisters. Yard personnel ground down each blister, applied rust inhibitor to the bare steel, applied new primer, and finally covered each addressed area with two coats of bottom paint.

58. Blisters like those observed on *Mare* are most likely caused by improper preparation or application of coatings or by surface contamination from an "outside source," such as a vessel getting its topsides polished next to the vessel that is being painted. (See Defs.' Ex. 182, p. 24.)[20]

---

[19] Tofias testified that the Seakeeper worked while sitting at the dock after Keuleyan's interventions, but that it still "doesn't work at all" when at sea. (8/9/17 Trial Tr., PageID #s 1123-24.) In the absence of any other evidence regarding the Seakeeper's current operational status, the Court credits this statement by Tofias because it is counter to the narrative he otherwise offered in his testimony, that multiple problems with his vessels caused by Front Street were definitively fixed at other yards.

[20] The Court is not convinced by Plaintiff's contention that stray current in the water may have caused the blistering on *Mare* given that this contention is not supported by any credible evidence in the record.

59. Front Street brought suit against W-US-1 in this Court on June 17, 2016, alleging that Front Street was owed for work it had done on *Wild Horses*. W-US-1 was served on July 12, 2016.

60. In August 2016, Tofias reported to others that he had discovered an enormous amount of rust in *Mare*'s bilge while searching for bumpers in the lazarette, a compartment in the bilge.

61. Tofias retained Michael Taylor, a marine surveyor and consultant, to investigate the rust issue. Taylor subsequently made over a dozen inspection visits to *Mare* at Newport Shipyard. Three of these inspections occurred in November 2016 when the vessel was in the water. The remaining inspections occurred after the vessel had been hauled and placed in a covered building at the yard in late November or early December 2016.

62. Taylor observed widespread corrosion in the bilge. He took extensive photographs that capture moderate to severe corrosion on the steel plating and on many internal structural elements.

63. Corrosion of the type documented by Taylor and others in *Mare*'s bilge may be caused by excessive standing water or condensation due to leaking hatches or the failure to properly dry and maintain the bilge when a vessel is hauled or stored. Excessive standing water or condensation can also cause coatings to fail, such as by lifting or peeling.

64. It is typical that there will be some amount of standing water in a vessel's bilge, but it is good marine practice to dry the bilge out when the vessel is hauled and to keep the bilge dehumidified during these periods. It is also good marine practice for a vessel's owner to undertake preventive maintenance of coated surfaces to address areas of incipient corrosion because, proverbially, "rust never sleeps." It is also a commonsense good practice to check a bilge periodically for signs of corrosion or other damage.

65. W-Class did not undertake preventive maintenance in *Mare*'s bilge,[21] and the coatings in the bilge were impacted by excessive standing water or condensation.[22]

66. There is no evidence that Front Street's statement in the bid documents that "[s]andblasting, priming and painting will follow to create a seal against corrosion" (Defs.' Ex. 35) means, within the yachting industry, that W-Class would not need to perform preventive maintenance or protect the coatings from excessive standing water or condensation.[23] The Court understands the statement in the bid documents to be a representation that Front Street would

---

[21] Defendants have not proffered evidence or even seriously contended that W-Class performed any preventive maintenance in the bilge. On the other hand, there *is* evidence that W-Class did not check the bilge periodically to determine maintenance needs or address incipient corrosion. The widespread and in some places severe corrosion in the bilge documented by Taylor and others suggests that corrosion would have been present and visible in the bilge before August 2016. Further, there are indications that W-Class never inspected various areas of the bilge after *Mare* left Front Street, such as the presence of used paint sticks ostensibly left behind by Front Street painters. The finding that W-Class did not undertake necessary preventive maintenance is not incompatible with Tofias's reputation as a fastidious yacht owner. The evidence in support of his reputation involves attention to the outward appearance of his vessels and not necessarily attention to issues like corrosion in the bilge. (See, e.g., 8/9/17 Trial Tr., PageID #s 1144-45.)

[22] There is substantial credible evidence that sea water was infiltrating the bilge through leaking hatches. Defendants' own expert Taylor documented evidence of salt water entry through the hatches. Plaintiff's expert Lundy corroborated that *Mare*'s two hatches providing entry to the bilge were not watertight. The Lombardi reports document that leaking hatches have been a recurring issue with *Mare*. The Lombardi survey includes a photograph of corrosion in the bilge that Lombardi attributed to the leaking hatches and that resembles the type of severe corrosion later documented in some areas of the bilge by Taylor. (See Defs.' Ex. 38, Bates No. 004353.) There is also credible evidence that the coatings in the bilge were exposed to other sources of water, such as the leaking hose photographed by Taylor directly over an area of severe corrosion. (See Defs.' Ex. 41.) Finally, Tofias himself admitted that there was a recurring issue with water in *Mare*'s bilge that preceded and continued after the replating at Front Street. (Pl.'s Ex. 63, pp. 17, 18.) The fact that there are large areas of the steel plating in the bilge that did not experience corrosion (see, e.g., Pl.'s Ex. 78F) also supports a conclusion that generalized failure of the coatings due to improper application was not the cause of the corrosion.

      The Court notes Taylor's testimony that the presence of salt deposits where the keel plate meets the bottom plate suggested that salt water was seeping into the bilge through improper welds by Front Street. However, Taylor did not adequately explain how saltwater deposits in this particular area would not be just as consistent with the normal presence of some degree of standing water in the bilge when the vessel is at sea.

      Taylor also observed spilled diesel fuel in the vessel's engine compartment allegedly resulting from someone mistakenly kicking the sight glass, an external fuel gauge, after the vessel had been hauled, and some pink liquid that he took to be antifreeze spilled when the vessel's engine and systems were being winterized. The Court does not consider the presence of spilled diesel fuel and antifreeze in the bilge to be necessarily indicative of the condition of *Mare*'s bilge before Tofias first reported the widespread corrosion.

[23] Taylor opined at trial that the bilge of a properly coated steel vessel should look like "the day after it was done" after three-and-a-half years in a saltwater environment where no owner maintenance had taken place. (8/11/17 Trial Tr., PageID # 1584.) In light of the testimony by Defendants' coatings expert Clarke, and by Taylor himself, about the importance of preventive maintenance and the ways in which coatings can be impacted by salt water, the Court does not find Taylor's opinion to be credible.

coat the new steel plates to reduce the incidence of corrosion, but not a warranty that the plates would remain corrosion free under all conditions and with no action on the part of the vessel owner.[24]

67. The accepted standard in the marine industry is that steel should be replaced if 25% of the thickness of steel plate, or 30% of the thickness of structural steel framing, is wasted or corroded. Although the bottom plating of *Mare* exhibits some degree of wastage, the wastage is not significant enough to compromise the vessel's seaworthiness or to require early replacement when the actual thickness of the plating (3/16-inch) is taken into account.[25]

## S/V *Wild Horses*

68. From the fall of 2013 through the summer of 2014, Front Street performed a variety of repairs and maintenance work on *Wild Horses*, including hauling and preparing the vessel for winter storage; repainting the topsides and bottom; and installing a generator and refrigeration system. The basis of the work was an oral agreement between Front Street and W-US-1 and the scope of work encompassed in the agreement expanded to include further tasks during the time *Wild Horses* was at the yard.

69. Front Street applied one coat of Micron 66 green bottom paint to the bottom of *Wild Horses* in the spring of 2014. Tofias specified the use of Micron 66, which was the paint that had previously been used on the vessel. Front Street was not asked to strip the bottom and remove

---

[24] The preponderance of the evidence does not establish that Front Street failed to coat other portions of the steel plates other than the area under the fuel tanks. The testimony by Defendants' experts on this point was equivocal at best. To the extent Clarke noted areas that he specifically identified as demonstrating improper application of coatings (see 8/14/17 Trial Tr., PageID # 1745), the Court cannot find by a preponderance of the evidence that these areas, which are unrelated to the corrosion problem, resulted in any damages to Defendants.

[25] Taylor's testimony that the steel plates under the fuel tanks require replacement is based on the erroneous assumption that the plates were originally ¼-inch thick.

all coatings including primer, and did not do so.  In addition to primer, a coat of Micron 66 green bottom paint previously applied by someone other than Front Street was already on the vessel.  Front Street sanded that existing coat and rolled on the new coat of bottom paint.  It is good marine practice to use consistent types of paint when applying a new coat over an existing coat.

70. Micron 66 is an ablative bottom paint that washes away like a bar of soap as a vessel is underway; the more miles traveled, the more the paint washes away.  Given this characteristic, in general practice Front Street recoats a vessel painted with Micron 66 yearly, although the paint should generally last more than a year.

71. Although Front Street continues to use Micron 66 and Tofias specified the use of Micron 66 on *Wild Horses*, there have been complaints in the yachting community about Micron 66 failing.

72. Since 2009, *Wild Horses* had experienced a vibration problem that had been addressed by several yards before *Wild Horses* arrived at Front Street in the fall of 2013.  The first two attempts to fix the problem were made by the vessel's builder, Brooklin Boatyard, in the winters of 2009-10 and 2010-11.  Brooklin Boatyard looked at the entire propulsion system from the engine to the propeller but was unable to solve the problem.  The third unsuccessful attempt to solve the vibration problem was undertaken in the fall of 2012 by a mechanic affiliated with the Rybovich marina in West Palm Beach, Florida.

73. At some point during the period that *Wild Horses* was at Front Street, Tofias asked the yard to investigate the vibration problem.  After the vessel's engine returned to the yard from being rebuilt at an outside marine engine distributor, Front Street replaced the engine mounts and checked the propeller, propeller shaft, and couplings for tightness and fit.  Front Street also

consulted with a propeller servicer about the possibility of using a smaller diameter shaft and adding a cutlass bearing to shorten up the length between the transmission output and the existing strut supporting the shaft. Front Street sea trialed *Wild Horses* between each step it took to determine if the vibration issue was being remediated.[26]

74. Addressing the vibration issue constituted undertaking a process of elimination to rule out possible causes and target possible solutions for a "systemic" problem. (See Pl.'s Ex. 63, p. 20.) However, Front Street was not allowed to complete the process of elimination because Tofias wanted to leave the yard to begin his racing season.[27]

75. Front Street charged $7,065.55 for its work on the vibration issue but did not solve the problem.

76. At some point while *Wild Horses* was at Front Street, Tofias also informed the yard that the vessel had excessive play and stiff spots in its steering system. Before the vessel left the yard to begin the racing season, Front Street replaced stops that were deteriorated and lubricated the sheaves.

77. At some point while *Wild Horses* was at Front Street, Turner informed Tofias that the vessel's time at the yard provided an opportunity to install a generator and a new refrigeration system that would run off the generator as opposed to the engine. Prior to installation of the generator, *Wild Horses* created electricity only by running the engine to charge the house batteries. The

---

[26] Although the parties dispute the exact point in time at which Tofias raised the vibration issue to Front Street, the Court determines that the exact point in time is not material. To the extent Tofias suggests that Front Street waited too long to begin its investigation of the vibration problem, the Court notes that Tofias approved the engine being sent out for a rebuild for reasons not restricted to the vibration issue and it was reasonable for Front Street to wait until the engine returned before investigating the problem.

[27] Tofias claims that he abruptly left the yard with *Wild Horses* and concluded that he "would never go back" to Front Street because of an incident during a sea trial when he feared that Turner would harm the vessel. (8/9/17 Trial Tr., PageID # 1022.) The Court does not credit this account. Not only is Tofias's account disputed, but it is undercut by the fact that he returned to Front Street for repair work on *Wild Horses* in August 2014.

installation of the generator therefore represented an upgrade and enhancement to *Wild Horses* separate from any impact on refrigeration.

78. With the existing refrigeration system, the engine had to be run for four hours in the morning and four hours in the evening to maintain refrigeration. Turner represented to Tofias that the new generator would only have to be run for an hour or two in the morning and an hour or two in the evening to maintain refrigeration. Tofias approved the work at least in part based on this representation.

79. Although the parties dispute exactly how much of the amounts Front Street charged W-US-1 are directly attributable to the installation of the generator and refrigeration system, there is no credible evidence that Front Street overcharged for the installation or exceeded a "will not exceed" estimate.

80. Before this lawsuit, Front Street did not receive any complaints from W-US-1 about the installation or operation of either the generator or the refrigeration system. During the course of this litigation, Tofias first claimed that it is necessary to run the generator for four hours in the morning and four hours in the evening, as opposed to the one to two hours in the morning and evening represented by Turner, to maintain refrigeration.[28]

81. *Wild Horses* returned to Front Street in August 2014 for emergency repair work after the vessel hit a rock off Isleboro, Maine. At that time, Front Street wanted to continue to work on the vibration issue, but Tofias "didn't have the time or interest in having them do it." (Pl.'s Ex. 63, p. 23.)

---

[28] The Court notes that Defendants' claim regarding the generator and refrigeration system changed during the course of this litigation. In their Amended Answer, Defendants contended that the generator and refrigeration system "require approximately ten (10) hours of generator time per day to maintain proper cooling in the refrigeration system," not the eight hours claimed at trial. (Am. Answer (ECF No. 26), PageID # 181.)

82. Front Street did continue its work on the steering system; the yard removed the compass and binnacle and observed that a few of the links of the chain were heavily corroded and frozen. Front Street ordered and installed a new chain and the system was tested. The test divulged that a clicking was in the system, so Front Street ordered a rebuild kit, which included replacement parts for the steering system. At some point, Front Street also lubricated the chain and suggested to Tofias that the vessel's crew was not keeping the chain adequately lubricated. However, Tofias left the yard with *Wild Horses* to go racing before the rebuild kit arrived and additional work could be done by Front Street.

83. The condition of the steering system on *Wild Horses* after the vessel left Front Street had no impact on its ability to win races and regattas. W-US-1 went on to have a successful racing season with *Wild Horses*, even winning a premier event.

84. Front Street charged $1,294.88 for its work on the steering system but did not solve the problem.

85. After leaving Front Street, Tofias continued to pursue a solution to the vibration issue with Newport Shipyard. In the fall of 2014, at the recommendation of Newport Shipyard, Tofias retained the services of a vibration specialist, John Koopman of Propulsion Data Services. After an initial sea trial, Koopman recommended several measures. Newport Shipyard realigned the engine and sent the propeller out to a company in Seattle, Washington, to be tightened. After this initial round of measures was taken, the vibration issue showed some improvement. However, after further use of the vessel, Tofias reported that the vibration problem had worsened again. Koopman conducted a subsequent round of sea trials and recommended additional measures. Eventually, based on Koopman's testing and recommendations, Newport Shipyard added a coupling and a cutlass bearing, replaced the

propeller shaft, and replaced the propeller itself. The vibration issue was resolved by sometime in 2016.[29]

86. A substantial reason for the vibration issue was the propeller. The type of propeller on *Wild Horses* is ordinarily prone to vibration issues and may be inappropriate for the unusual angled line shaft on the vessel. Tofias was initially reluctant to replace the propeller due to the expense but was convinced it needed replacement after other potential causes of the vibration problem were eliminated.

87. Newport Shipyard charged $17,111.95 to resolve the vibration issue. Koopman charged $2,744.25 for his consulting work. The cost of a new Gori propeller was $4,092.00.

88. *Wild Horses* was hauled and stored outside on blocks at Newport Shipyard in November 2014. Tofias was present and did not see any flaking paint on the bottom at that time. The vessel's bottom, keel, and rudder were exposed to the elements from November 2014 through April 2015. In April 2015, Tofias reported seeing flaking or peeling paint on the vessel's bottom. Photographs of the vessel taken at that time show layers of bottom paint flaking off and exposing the primer. The peeling paint was due to the failure of certain layers of coating to

---

[29] There is no credible evidence that any measures taken by Front Street involving the engine, shaft, or propeller exacerbated or in any way contributed to the pre-existing vibration problem. In particular, to the extent Koopman noted an issue with how a generator alternator was cantilevered off the engine, Front Street was not responsible for this element and the vibration problem persisted even after this element was reconfigured.

adhere to the layers beneath them.[30]  Newport Shipyard subsequently recoated the bottom but did not use Micron 66.[31]

89. In 2015, Tofias asked Newport Shipyard to address the excessive play and stiff spots in the steering system.  After disassembling the steering mechanism, Newport Shipyard personnel determined that the sprocket was excessively worn and replaced it.[32]  After the repairs were completed, the steering system on *Wild Horses* worked properly.  Newport Shipyard charged $6,119.67 for its work on the steering system.

90. Front Street routinely sent invoices for the work done on *Wild Horses* to W-Class/W-US-1, but not all of the work was paid for.  All of the work billed for was in fact performed by Front Street.

91. At all times relevant to this suit, Front Street charged its customers, including W-Class and W-US-1, interest on any past due amounts at the rate of 1.5%.  Front Street did not discuss the issue of interest or the interest rate with Tofias.  Tofias was sent invoices with the interest rate designated and made payments on those invoices.

92. Between 2013 and 2014, Front Street raised its labor rate from $60/hour to $65/hour.  Front Street raises its labor rates annually but did not discuss the change with Tofias.  Tofias was

---

[30] Regarding the paint condition on *Wild Horses*, paint sales representative Moldveen saw the condition but could not recall what the condition looked like, let alone identify its cause.  Newport Shipyard paint shop supervisor Mitchell testified that the "bottom paint [was] flaking off of the bottom" (Defs.' Ex. 180, p. 42) and that the paint was "not bonding to the substrate underneath" (id., p. 45), which is consistent with the description of the condition in the bottom report (Defs.' Ex. 16), but could not clearly testify that a single outermost layer of bottom paint was peeling off of a layer of bottom paint directly underneath.  In other words, the Court cannot conclude from Mitchell's testimony, or from the photographs of the bottom of *Wild Horses*, that the peeling layer was the layer applied by Front Street.

[31] Moldveen testified about the negative impact of sustained fresh water exposure on Micron 66 and the condition called cornflaking or lipsticking, but there is no credible evidence in the record that this was the condition observed on the vessel's bottom.

[32] To the extent there was an issue with how the existing sprocket was welded, this welding was not done by Front Street.

sent invoices reflecting the increase in the labor rate and made payments on those invoices. (See Pl.'s Ex. 60.)

93. The charges for the work Front Street performed on *Wild Horses* are reasonable and within marine shipyard industry standards for New England.

94. As of November 20, 2015, Front Street was owed $54,084.36, plus interest, for its work on *Wild Horses*.

## II.  CONCLUSIONS OF LAW

1. This Court has jurisdiction over this admiralty action pursuant to 28 U.S.C. § 1333(1).

2. "Admiralty jurisdiction brings with it a body of federal jurisprudence, largely uncodified, known as maritime law." <u>Fairest-Knight v. Marine World Distribs., Inc.</u>, 652 F.3d 94, 98 (1st Cir. 2011) (quotation marks omitted).  "In the absence of a relevant statute, the judicially-developed norms of the general maritime law, an amalgam of traditional common-law rules, modifications of those rules, and newly created rules, governs actions in admiralty." <u>Id.</u> (quotation marks omitted).  In addition, "[a]lthough state law may supplement federal maritime law when the latter is silent or where a local matter is at issue, it may not be applied where it would conflict with [federal] maritime law." <u>Id.</u> (quotation marks omitted).

3. Front Street asserts (a) claims for breach of contract, breach of the duty of good faith and fair dealing, and misrepresentation against both Defendants arising out of the work undertaken by Front Street on *Wild Horses*; (b) a maritime lien, in personam, against W-US-1 for the outstanding balance allegedly owed for work undertaken by Front Street on *Wild Horses*; (c) a claim for quantum meruit against both Defendants for the value of the work on *Wild Horses*; and (d) an "action on an account" against both Defendants based on the account statement

attached to Front Street's Amended Complaint in the amount of $54,084.36, plus interest. (First Am. Compl. (ECF No. 5), PageID #s 14-17; Ex. A to Am. Compl. (ECF No. 7).) All of these claims are different avenues to the core relief Front Street seeks, the $54,084.36 the yard alleges it is owed by Defendants.

4. Defendants have asserted the affirmative defense of set-off with regard to Front Street's claims, seeking to set off the amounts due arising out of alleged damages to *Wild Horses* by Front Street.

5. Defendants assert counterclaims for breach of contract and breach of the implied warranty of workmanlike performance by Front Street in regard to the *Mare* refit. (Am. Answer (ECF No. 26), PageID #s 177-78.) Defendants also assert counterclaims for breach of contract, breach of the implied warranty of workmanlike performance, breach of the implied warranty of fitness for a particular purpose, and misrepresentation by Front Street regarding the *Wild Horses* repairs in 2013-14. (Id., PageID #s 178-82.)

6. Contracts for repairs to a vessel fall within the general maritime law and are governed by admiralty principles. See Fairest-Knight, 652 F.3d at 98; 1 T.J. Schoenbaum, *Admiralty and Maritime Law* § 5-8, at 291 (5th ed. 2011).

7. *Oral* contracts for the repair of a vessel are enforceable under the general maritime law. See Kossick v. United Fruit Co., 365 U.S. 731, 734 (1961) ("[I]t is an established rule of ancient respectability that oral contracts are generally regarded as valid by maritime law."). The parties do not dispute the existence of oral contracts regarding both *Wild Horses* and *Mare*.

8. Common law principles regarding breach of contract apply to contracts in admiralty law. 1 Schoenbaum, supra. Generally, a party's failure to pay for services rendered under a contract may give rise to a claim for breach of contract. See Caribbean Seaside Heights Props., Inc. v.

Erikon LLC, 867 F.3d 42, 45 n.3 (1st Cir. 2017). When the claim involves breach of a term other than payment, "[a] defendant who breaches a contract is only liable for the damages *caused* by its breach." Jakobiec v. Merrill Lynch Life Ins. Co., 711 F.3d 217, 224 (1st Cir. 2013).

9. To prevail on a claim for breach of the implied warranty of workmanlike performance, the claimant must show that the other party failed to perform repairs or improvements in a workmanlike manner. A repairer is responsible for using "that degree of diligence, attention, and skill which is adequate to complete the task." 1 Schoenbaum, supra, § 5-8, at 293. A vessel owner can recover for a breach of the implied warranty of workmanlike performance even when "such performance was done without negligence." Fairest-Knight, 652 F.3d at 99 (quotation marks omitted). However, the vessel owner must prove that any breach of the warranty was *the proximate cause* of any actual damages. Id. "In other words, [t]o give rise to liability, a culpable act or omission must have been a substantial and material factor in causing the injury." Great Am. Ins. Co. v. Pride, 847 F. Supp. 2d 191, 204 (D. Me. 2012) (quotation marks omitted). Proximate causation must be proven by a preponderance of the evidence. Fairest-Knight, 652 F.3d at 99. It is not the case that "once a shipyard has undertaken to repair a boat, any subsequent breakdowns or problems may, without more, be presumed to have been caused by the shipyard." Id. at 100.

## Front Street's Claims

10. The Court concludes that Defendants have breached the oral contract with Front Street concerning the work on *Wild Horses* in 2013-2014 and owe Front Street the sum of $54,084.36, the amount reasonably charged by Front Street but not paid by Defendants.

11. Both W-Class and W-US-1 are jointly liable in that either is liable to Front Street for the entire amount due. Defendants fault Plaintiff for using the phrase "joint and several liability," but Defendants do not challenge the existence of the analogous concept of joint liability in contract. See Tilcon Capaldi, Inc. v. Feldman, 249 F.3d 54, 62 (1st Cir. 2001) ("Joint liability (typically, for breach of contract) does *not* differ [from joint and several liability in the tort context in that] each party jointly liable for a judgment for breach of contract is liable for the *full* amount.") Defendants also have not clearly disputed that both W-Class and W-US-1 may be held liable for the charges owed on *Wild Horses* given that Tofias used the two companies interchangeably in dealing with Front Street and made payments for the *Wild Horses* work by W-Class check and on W-Class credit cards. (See Pl.'s Ex. 60.)

12. In addition to the amount due on the invoices, the Court awards Plaintiff prejudgment interest in its discretion because this case does not present exceptional circumstances counseling against such an award. See Clifford v. M/V Islander, 846 F.2d 111, 113 (1st Cir. 1988) (per curiam) ("[P]rejudgment interest will normally be awarded in admiralty, absent exceptional circumstances . . . ."); see also City of Milwaukee v. Cement Div., Nat'l Gypsum Co., 515 U.S. 189, 195-96 (1995) ("The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss. Full compensation has long been recognized as a basic principle of admiralty law . . . .") (footnote omitted). This Court's "discretion also extends to the rate of interest to be applied, with the choice to be guided by equitable factors." Gross v. Sun Life Assurance Co. of Canada, 880 F.3d 1, 19 (1st Cir. 2018). Taking into account Front Street's existing 1.5% interest charge on past due amounts, the length of time Front Street has waited to recover what it is owed, and the existing federal rate of interest, the Court determines that the federal rate of interest provides full compensation for

Front Street without resulting in an unfair windfall.  See id. at 19-21.[33]  The Court therefore

awards prejudgment interest at the federal statutory rate from the date Plaintiff filed its

Complaint, June 17, 2016.  See 28 U.S.C. § 1961(a); Gross, 880 F.3d at 20-22 (suggesting, in

the context of an ERISA case, that where a court has broad discretion to set prejudgment

interest, the court may rely on the federal statutory rate even though Section 1961(a) only

explicitly refers to *post*judgment interest); see also Gele v. Wilson, 616 F.2d 146, 148 (5th Cir.

1980) ("Section 1961 is applicable to judgments rendered in admiralty just as it is to judgments

in traditional civil litigation.").

13. Because the Court determines that Defendants are liable for the entire amount of damages

    Plaintiff seeks on a breach of contract theory, the Court need not, and does not, address the

    merits of Plaintiff's other theories of liability.

14. Plaintiff has also requested the award of attorney's fees.  "Under admiralty law, a court has

    inherent power to assess attorneys' fees when a party has acted in bad faith, vexatiously,

    wantonly, or for oppressive reasons."  Templeman v. Chris Craft Corp., 770 F.2d 245, 250 (1st

    Cir. 1985) (quotation marks omitted).  Although it is a close case, the Court ultimately

    concludes that Defendants did not act in bad faith or vexatiously and declines to award Plaintiff

    attorney's fees.

---

[33] The Court in its discretion awards Plaintiff prejudgment interest at the federal statutory rate from the time Plaintiff filed its Complaint rather than awarding interest at the 1.5% rate from the time the invoice amounts became past due. The Court notes that Plaintiff has requested an award of interest but has not specifically requested an award of interest pursuant to its 1.5% interest charge or attempted to calculate that amount.  The Court also notes that Defendants suggested a 2.5% prejudgment interest rate in regard to their counterclaims (see Defs.' Response to Pl.'s Proposed Findings of Fact and Conclusions of Law (ECF No. 110), PageID # 2057), which is higher than the federal statutory rate on the date of this Order.

15. Defendants as Counterclaim Plaintiffs allege that Front Street breached the oral contract and breached the implied warranty of workmanlike performance by failing to complete the *Mare* refit in a workmanlike manner.  Specifically, Defendants allege that Front Street failed to properly coat the new steel plates it used to replate the vessel's bottom, failed to properly install the Seakeeper, and failed to rewire the vessel to meet applicable standards.  (Am. Answer, PageID #s 177-78.)

16. Regarding the blisters observed on *Mare*'s bottom (i.e., on the exterior faces of the new steel plates installed by Front Street) at Newport Shipyard in 2015, the preponderance of the evidence does not establish that any action by Front Street was the proximate cause.  The evidence that Front Street did not properly coat the bottom is equivocal at best: although Front Street did not keep detailed records of the coating project or follow all best practices in terms of gauging the profiling and primer, there is no direct evidence that Front Street failed to properly apply the coating and Davis, who was acting as Tofias's eyes and ears on the project, was satisfied with Front Street's work.  More importantly, the Court cannot by a preponderance of the evidence attribute the blistering condition to any failure on Front Street's part considering that the bottom was recoated by *Mare*'s crew between when the vessel left Front Street and when the blisters were observed.  For all these reasons, Defendants' counterclaim on this issue fails.

17. Regarding the corrosion in *Mare*'s bilge (i.e., on the interior faces of the new steel plates installed by Front Street), the preponderance of the evidence likewise does not establish that any action by Front Street was the proximate cause.  Once again, there is little evidence that Front Street improperly coated the interior faces of the steel plates, with the exception of the

areas under the fuel tanks, as discussed below. There is also significant evidence that any breach on Front Street's part was not a substantial and material factor in causing the corrosion, that is, a proximate cause. Both of Defendants' experts who substantively analyzed the bilge corrosion, Taylor and Clarke, testified that corrosion in a steel bilge can be caused by the intrusion of salt water, failure to keep a bilge adequately dry, and failure to undertake preventive maintenance. They further acknowledged that it is good marine practice and commonsense to undertake preventive maintenance to address incipient corrosion in a bilge. As previously explained, there is no evidence that Tofias undertook preventive maintenance or properly maintained the bilge to ensure the integrity of the coatings.[34] There is also evidence of ongoing salt water intrusion into the bilge from the hatches, as Taylor acknowledged; this salt water intrusion is corroborated by the observations of corrosion due to leaking hatches in the Lombardi reports. Furthermore, there is at least some evidence of other reasons for the failure of the coatings, including leaking hoses and excessive standing water. For these reasons, the preponderance of the evidence does not establish that any failure to properly apply coatings to the interior faces of the steel plates was the proximate cause of the widespread corrosion in *Mare*'s bilge, and Defendants' counterclaim on this issue fails.

18. The Court does conclude that Front Street breached the oral contract and the implied warranty of workmanlike performance by failing to coat the steel plates under the fuel tanks. However, Defendants have not proved that this failure was the proximate cause of the severe corrosion

---

[34] Plaintiff asks the Court to draw an adverse inference that W-Class did not maintain the bilge based on Defendants' failure to produce the *Mare* maintenance logbooks. The Court declines to draw such an inference because there is no evidence that Defendants destroyed or failed to preserve the logbooks in bad faith. See Sharp v. Hylas Yachts, LLC, 872 F.3d 31, 42 (1st Cir. 2017) ("Although it is true that an adverse inference instruction may be allowed when a party fails to produce [evidence] that exists or should exist and is within [the party's] control, such an instruction usually makes sense only where the evidence permits a finding of bad faith destruction." (internal citation and quotation marks omitted)). This simply means that the Court does not infer *based on the absence of the logbooks* that W-Class did not undertake necessary preventive maintenance in *Mare*'s bilge.

in this area in light of the multiple plausible reasons for the corrosion that are not attributable to Front Street. Furthermore, even assuming causation, Defendants have failed to prove their measure of damages for cleaning and coating the plates under the fuel tanks given that there is no credible evidence that the plates require replacement.

19. To the extent Defendants contend that Front Street is liable for corrosion on structural elements, pipes, valves, or fittings in the bilge, the preponderance of the evidence does not establish that coating these elements was within the scope of work under the oral contract for the *Mare* refit. Further, the evidence that Front Street did not coat certain elements at all is equivocal at best. Finally, where there is credible evidence that Front Street did not coat an element in the bilge that it perhaps should have coated, such as the bulkhead behind the Seakeeper, Defendants have not proved any measure of damages resulting from that failure.

20. Regarding the installation of the Seakeeper on *Mare*, the preponderance of the evidence does not establish that any act or omission by Front Street was responsible for the Seakeeper's operation issues. Defendants' only credible evidence that there was any issue with the Seakeeper's operation after its installation at Front Street is the testimony of Sarkis Keuleyan. But his testimony as to the cause of any issue with the Seakeeper is seriously undermined by the fact that the Seakeeper continues to have the type of operation issues that Tofias described to Keuleyan in December 2014. Simply put, there is no credible evidence of what caused any issue with the Seakeeper and therefore no credible evidence that Front Street is liable.

21. Finally, Defendants have not proved by a preponderance of the evidence that they sustained any damages resulting from Front Street's general failure to rewire *Mare* and install necessary equipment to bring the vessel up to standards. Seakeeper aside, Defendants have not proved that there were any problems in operating the vessel that resulted from the wiring and systems

not being up to standard, nor have Defendants proved that they paid for work that Front Street did not perform. The sole exception in this regard is the electrical panel that Front Street did not wire for 240 volts although the relevant invoice states in a long recital of completed tasks that Front Street had done so. However, Defendants have not clearly asserted, let alone proved by a preponderance of the evidence, that they in fact paid for time or materials for this particular task as opposed to the other completed tasks enumerated in that invoice.

### Defendants' Counterclaims – S/V *Wild Horses*

22. Defendants as Counterclaim Plaintiffs allege that Front Street breached the terms of the oral contract and breached the implied warranty of workmanlike performance in the steps it took to address the steering issue, to address the vibration issue, and to paint the vessel's bottom. (Am. Answer, PageID #s 178-80.)

23. Regarding the steps Front Street took to address the steering issue, the preponderance of the evidence does not establish that Front Street acted deficiently in any way. Although Richard Franklin, the machine shop and mechanics supervisor at Newport Shipyard, testified that his replacement of a sprocket in the steering system finally solved the problem, there is no credible evidence that the steps taken by Front Street prior to the work being done at Newport Shipyard, including replacing the chain, were not also necessary to addressing the steering problem. There is also no credible evidence that Front Street's decision to lubricate the chain was unnecessary or that its suggestion to Tofias that the vessel's crew was not adequately lubricating the chain in any way exacerbated the problem or delayed its solution. On the other hand, there is credible evidence that Front Street would have proceeded to complete the repairs

and replace the sprocket if Tofias had not taken *Wild Horses* to sea before Front Street received the rebuild kit.  For these reasons, Defendants' counterclaim on this issue fails.

24. Regarding the steps Front Street took to address the vibration issue, the preponderance of the evidence does not establish that Front Street acted deficiently in any way.  It is undisputed that the vibration issue existed long before Front Street attempted to address it.  It is undisputed that the vibration issue continued to exist for between one and two years after *Wild Horses* left the yard, even as Newport Shipyard took multiple expensive steps to address the problem.  It is undisputed that solving the vibration issue involved a process of elimination and multiple attempts to isolate the cause or causes.  Finally, it is undisputed that the vibration issue was solved after Newport Shipyard replaced the propeller, which was an expensive step Newport Shipyard only took after performing multiple other measures.  Given these undisputed facts, Front Street's failure to solve the problem during the time *Wild Horses* was at the yard cannot be characterized as deficient.  To the contrary, the fact that Newport Shipyard, in consultation with a vibration specialist, spent thousands of dollars over the course of several rounds of work over one to two years to solve the problem suggests that Front Street did not act deficiently.  For this reason, Defendants' counterclaim on this issue fails.

25. Regarding the paint condition observed on the vessel's bottom at Newport Shipyard, the preponderance of the evidence does not establish that any act by Front Street was the proximate cause.  There is simply no direct evidence that Front Street improperly prepared the bottom or improperly applied the single coat of bottom paint.  Nor can the Court conclude by a preponderance of the evidence that the peeling layer of coating observed at Newport Shipyard was in fact the layer applied by Front Street and not another previously applied layer of bottom

paint.  Finally, there is some evidence that the peeling could have resulted from a failure of the Micron 66 product.  For these reasons, Defendants' counterclaim on this issue fails.

26. Finally, Defendants as Counterclaim Plaintiffs allege that Front Street breached the oral contract, breached the implied warranty of workmanlike performance, breached the implied warranty of fitness for a particular purpose, and made intentional or negligent misrepresentations regarding the installation of the generator and refrigeration system on *Wild Horses*.  (Am. Answer, PageID #s 178-82.)  The basis for all of these claims is Tofias's contention that the generator and refrigeration system do not work in tandem as Front Street represented they would.  However, there is absolutely no credible evidence that the systems are not working as Front Street represented.  The only evidence whatsoever regarding the performance of the generator and refrigeration system after *Wild Horses* left Front Street are uncorroborated representations made by Tofias during the course of the present litigation.  The Court simply does not find Tofias's self-serving statements to be credible.  For these reasons, Defendants' counterclaims on this issue fail.


III.     CONCLUSION

For the reasons set forth above, the Court ORDERS that judgment shall be entered in favor of Plaintiff in the amount of $54,084.36, plus prejudgment interest at the federal statutory rate from June 17, 2016.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 20th day of February, 2018.